Thank you. The next case on our docket is INRI ON24, Inc., Securities Litigation, Leadercell Innotech ESG v. ON24. May I please deport Tom Hoffman of Labiton Keller on behalf of Plaintiff Appellant. Your Honors, we submit that under McQuarrie, Alphabet, and Facebook, the offering documents were required to say enough here to dispel the false impression that the risk of material churn was merely a hypothetical future prospect. For example, they could have said, they could have disclosed that material churn was occurring and was reasonably likely to increase. Just as a reset and a palate cleanser, Your Honors, here we are under Rule 8, Iqbal and Swambley. Unlike the prior cases that Your Honors heard, we are not in the land of. Does it matter how much churn was occurring as it relates to those cases that you cited and then to this case here? It does matter that there was a risk of material churn, Your Honor. The precise number does not matter, and we submit that the District Court erred by misreading the various churn estimates across different customer segments as fatal inconsistencies when in fact they just had to do with different customer segments that naturally experienced different levels of churn. As a matter of fact, it would be unusual if different salespeople with different books of business were experiencing the exact same level of churn. So what do you think was happening here? I mean, because I'm trying to determine if that was sufficient to be a material. We believe it was. So our primary CW allegations about this from FE2, the District Court, I think, misunderstood FE2's allegations. FE2's statement about a 40 to 50 percent churn level, we believe that applied to his entire book for 2020, whereas there was a higher 80 percent level that FE2 discussed, and that was the new business, which of course during the COVID-19 pandemic, we allege and was well understood within the company that it was going more towards the one-time event customers and the small and medium-sized business customers instead of the more reliable and profitable enterprise customers that were on 24's customers prior to the pandemic. And it seems that the District Court made some assessments here and that, you know, that those statements offered in support of the churn and whether it was material, I think she found them to be either inconsistent or contradictory, I don't remember what the language was right now, but and between that and the ARR, I think is kind of what she primarily relied on in saying that the complaint was implausible. So that is what I wanted to ask you to address both of those. It sounds like you're starting to address the one.  So let me first square the CW allegations and then absolutely address the post IPO growth that the court talked about. So number one, we just talked about FE2. There are three CWs that have these churn estimates. It's FE2 and then FE7 and 8. There are other FEs or CWs, sometimes they're called alleged in the complaint. But the court saw inconsistencies where there really are none. Number one, FE7 actually closely corroborated FE2's churn estimates, stating that for his team, the atypical pandemic customers churned at a rate of 75 to 80%, which is almost exactly what FE2 said about the new business generated in 2020. This is the atypical business. FE8 also corroborates and does not contradict what FE's 2 and 7 say. FE8 estimated 43% of his accounts from 2020 would churn or downsell and 50% of new accounts up for renewal would likely to churn. The district court focused on a different number, the 30% renewal rate. But that's actually very consistent with FE2 and FE7 because that's the inverse of the churn rate, is the renewal rate. I mean, I had a bit of a, I'm sorry to interrupt, but I had a bit of a different reaction to the weighing through the inconsistencies, and it seemed not appropriate to do this on a motion to dismiss, that this was about weighing different kinds of evidence. And I do see potential inconsistencies between the FE's. But I wonder if you can speak to why that is something that a district court should be allowed to address at a motion to dismiss stage, especially under Rule 8, as opposed to at a later stage of the litigation proceedings. Well, you're preaching to the choir. Certainly, we believe that it should be held, that level of scrutiny in a way should be held until a later stage of the litigation, particularly here where all of the FE's are singing from the same hymnal when it comes to the fact that there was material churn, particularly in the one time and S&B business segments, which was the real problem here in advance of the IPO. And so, Your Honor, we certainly agree that at this procedural stage, given Rule 8, Iqbal and Twombly, we have definitely plausibly alleged that there was a risk of material churn. Whether it was 50% or 80% or what have you. Let me ask, let me ask this. The court below also seemed to rely on these financial documents that it took judicial notice of. And I understand that this was not objected to, and I'm wondering, I'm wondering why. Because again, this has a flavor that it seems evidence weighing to me, but why was there no objection to that here? Your Honor, and this is getting to the Chief Judge's comment about the post-IPO growth, and that's why the defendants put in the request for judicial notice. So number one, you have to look at the registration statement and the offering documents at the time of the IPO. And so we do allege that the post-IPO growth, or we do argue, I should say, that the post-IPO growth is irrelevant for that same, for that reason. But even if you look at the post-IPO growth, those arguments still fail. Because if you look, I believe it's page eight in the defendant's opposition brief, there's a chart that shows the post-IPO growth. And we believe that this supports our allegations rather than defendants, frankly, because it doesn't show that year-over-year growth, while at the quarter of the IPO, it was a robust 102%. It fell off a cliff after that. The very next quarter, it was 43%. A few months later, it turns negative and is negative 2%, which is absolutely consistent with our story and our allegations about the churn in this case. Moreover, their argument completely ignores the stock price, which we did allege in the complaint alleges that the company's stock price plummeted as a result of the revelation of the allegedly concealed information. Specifically, paragraph 27, we allege that as a result of the undisclosed adverse facts alleged herein that existed at the time of the IPO, on 24, common stock plummeted, falling from the IPO price of $50 per share to close at $18.86 per share on November 3rd, 2021, the date the action was filed. Stock dropped at that magnitude note shows that investors were surprised, and importantly, this was not a stock that was up and down, up and down. Stock price never recovered. The complaint further alleges at paragraph 27, on 24, stock price has never recovered and has continued to significantly decline, closing at $6.83 on September 1, 2023. Your Honors, yesterday it closed at $5.50 a share. That means that a $1,000 investment in this IPO is worth $110 today. So if we were to consider the company's post-IPO performance, I think we have to consider the totality of the circumstances here, including the stock price performance, which we think belies the defendant's growth story completely. And importantly, it's not for defendants to tell investors what metrics they should care about. When it came to light that the company was experiencing this material churn, the stock price plummeted and never recovered. So let me ask you why statement, I'm kind of focused on statement four, and why wasn't statement four sufficient to inform any potential, you know, the stockholders in any potential? Statement four is one of the three risk disclosures that we allege to be deficient. And I'm just trying to figure out, is it really deficient? I mean, it says, we may not be able to sustain our recent revenue growth rate in the future. Our recent revenue growth has been significantly impacted by an increasing demand for our platform and products following the onset of the COVID-19 pandemic and resulting precautionary measures. As the impact of COVID-19 lessens, there may be reduced demand for our platform and our revenue growth may decline. If these new customers elect not to continue their subscriptions, as the impact of COVID-19 lessens, our business financial condition and results of operation would be harmed. That's right. And the, this court's decisions in Alphabet and Facebook are just squarely on point and show that that type of disclosure, which talks about may and would be harmed, is not sufficient. Whereas here, they're misleading because the risk of material churn had already come to fruition. And this is important, I think, for your Honor's consideration of this case, is when does it come to fruition? And here, I think the Alphabet court's reasoning is right on point, where it says, here the complaint plausibly alleges that these risks of harm ripened into actual harm when the privacy bug was detected by the company and created the new risk that this discovery would become public. So it's when the company detects the risk, that's when it ripens into actual harm. That's Alphabet 1F4 at 703. And it's, I think, useful to step back and talk about Alphabet, and Alphabet, this court held that risk disclosures that speak entirely of as yet unrealized risks and contingencies and do not alert the reader that some of these risks may have already come to fruition can mislead reasonable investors. That's exactly what your Honor is asking about. In a key passage of its order, the district court reasoned that at the time of the IPO, defendants could not have known that the customers who still had time left in their one-year subscription were not going to renew. The problematic part about that is that the district court stated, in other words, even if plaintiff was able to demonstrate there was high churn from customers who subscribed in the three quarters prior to the IPO, that churn would not be felt until post-IPO. But in Facebook, this court held that a risk warning, quote, could be misleading even if the magnitude of the ensuing harm was still unknown. And it's plausibly materially misleading, even if defendant did not yet know the extent of the harm it would suffer. So the risk has come to fruition. There is a material risk. Even though they don't know, to your Honor's point, precisely what the churn rate is going to be or the impact of the financials on the company, these disclosures are still materially misleading. Can you take a moment and address Statements 1 and 3, particularly as to Statement 1, the highly engaged and loyal customer base? What about that is misleading? How is that at all subject to some kind of objective verification? Well, of course, when the company puts at issue the source of its revenues, that is the hook for liability. To talk about the loyal customer base while not disclosing that all of this new business that the company has been writing throughout 2020, which is leading to this impressive growth, those customers have told you that they're not going to renew their contracts. We believe that's a material omission. And importantly, Your Honor, you have to read all of these statements together and the prospectus, because together they create a misleading impression that this is merely something that might happen or would have an impact on the company if it does come to light. But when you read them all together and in context, they said they have this highly engaged and loyal customer base. Statement 1, Statement 2, they're acquiring new customers and expanding subscriptions. Their growth has accelerated in 2020, partly in response to the COVID-19 pandemic. So they're touting this new customer growth and specifically in Statement 2, the new growth from 2020 and the pandemic era customers. And then you have the risk factor saying things like may and would, but never do they tell investors that this is actually happening. It's happened before the IPO. It has already come to fruition in the words of the Alphabet Court. And that is materially misleading. That would be material to a reasonable investor, which is how we have to judge this entire case, is according to what a reasonable investor would think. That's highly material quantitatively and qualitatively to a reasonable investor. And I see I'm out of time. I'll reserve the two seconds. A minute or two. May it please the court, Brian Matsui for defendants. The district court correctly dismissed plaintiff's amended complaint for three reasons. First, plaintiff has at best allege a risk of post IPO non-renewals. And even assuming that risk exists, ON 24 fully disclosed it, including the very reason why that risk existed, the uncertainty related to COVID-19 in February 2021. Second, the district court correctly recognized that the complaint undermined the existence of actual non-renewals, including because ON 24's actual financial performance showed there was no material churn at the time of the IPO. And third, the first three challenge statements are mere corporate optimism. When you have a statement like a highly engaged and loyal customer base or forward-looking statements where the company says, we believe, those simply are not actionable. So I'd like to start with the risk disclosures and the notion that there was actual churn at the time of the IPO. There was an actual churn. There are no allegations to support actual churn of the IPO, the actual non-renewal of accounts at the time of the IPO. Plaintiff really has mostly walked away from that, in part because the financial metrics in the offering documents themselves show that NRR and ARR were increasing and the number of customers was increasing. So there aren't actually... But given, I just, I'm trying to figure this out, given that we're operating under the lower pleading standard, I mean, we heard, if you were here for the last case, it's under full 9B, but this is rule eight, and that's not disputed, is that correct? That's correct. Okay. Why aren't the six-month contracts enough to allege that a material amount of churn happened before the February 2021 IPO, I guess, along with what these CWs were saying? So that wouldn't be material, just the six-month contracts. If you look at the allegations and the complaint, like at ER 53, paragraph 161, FE 7 basically says there's a handful of six-month contracts. Realistically, these contracts, which were being signed in 2020, after March of 2020, in fact, some of the FEs say that these didn't really start getting signed until November 2020, that's FE 2 at ER 45 to 47. They wouldn't come up into renewal until sometime in 2021 after the date. But I think, counsel, I guess the trouble I have with that is that if the allegations say that there's a certain amount of customer base, I think, to me, there are two principal allegations. One is that the customer base for the company started to shift into a more risky SMB model, and so there's a significant number of clientele that are not the legacy steady customers. And then the second one is that the company knew that a big chunk of those customers were not planning to renew or were planning to downsell. And so whether that materializes later is different than whether the company was aware of and had a material obligation to disclose those risks. And I see from FE 2 and FE 1 and others that those have been adequately alleged, and why is that not the case? So I'd like to address the second point that you made first with respect to the notion that this was going to happen, in effect. That's this court's precedent in STAC. What this court's precedent in STAC makes clear is that when there is a risk of something happening, even when the company in STAC was told by Microsoft that it was going to release a competing product, it still was just a risk. And then it was still sufficient for the company to say there was no assurance, that it was something that could happen. And the reason why is because that depends upon the actions of a third party. And that's precisely what we have here. Whether or not these customers would actually not renew, which would be after the IPO, would depend upon the actions of a third party. And that's what this court's decision in STAC makes clear. Now Facebook and Alphabet, what the plaintiff is doing here is clever. It says that the risk materialized. But the risk materialized isn't that the risk of something happening in the future became more concrete. It's that the actual event the company was worried about actually occurred. And in Alphabet, the actual event that they were worried about was that there would be a privacy bug. And there was a privacy bug. We have to take this in the light most favorable to the plaintiff, do we not? Of course we do. But the problem with plaintiff's allegations are, is that there is no allegations, plausible non-renewals at the time of the IPO. That's what they basically would need to show. But they were tracking this specific information because it seemed like they were concerned about the non-renewals. All companies would be, Your Honor. Certainly, they would be concerned about that. And they fully disclosed this risk in the risk disclosure. These aren't generic disclosures, as plaintiff says. So what do you think they would have needed to have to really be obligated, I guess, under your view to disclose? I think in a situation like this, had there been an actual material number of customers that did not, that like canceled their contracts, that their contracts expired before the IPO, which would have shown up in the metrics, then that would be something that would show that there could be. And so in your view, the handful plus the FEs or CWs that we're saying looks like, you know, 20% to 80% are not going to renew or there's a risk of non-renewing, that's, when they know that, when they're seeing that, they're hearing that, that's not enough? You do it in the light most favorable to the plaintiff? It is, Your Honor, because we're taking those allegations in the light most favorable to  I'm going to set aside the inconsistency point. But the light most favorable to the plaintiff, what you have is that there are customers that are at a risk of not renewing their contract after February of 2021. And that's precisely what this court's stack decision said. You don't need to say that that's something that's a certainty. Are we splitting hairs? The allegations are that the company was tracking it very carefully and color coding each customer. And a certain number of them were, I guess, red, for lack of a better, I don't know what the actual colors were, saying these customers are not planning to renew. And so you may call it a risk and it's still a future event, but it's a pretty concrete one that the company is asserting. And so at the very least, let me go back to my first main allegation point. Why wouldn't the company have been required to disclose that its customer base had completely shifted into a more risky group? And I take the point that you may not agree with it or not, but why isn't that a material disclosure that needed to have happened? Because there's nothing in the documents themselves, there's no challenge statement they're talking about which says that there's something about the type of customer base. But regardless, even setting that aside, the company said that at SER 111 that it never excludes had any certain type of customer. And the fact of the matter is that from the offering documents themselves at SER 69, 66% of the AR came from large companies. And so you have financial metrics that... But you also have a stock price that dove based on the fact that it didn't meet expectations of the growth and plaintiffs are tying it to the type of customer base and the churn and that it came in less than what was expected. Of course you're right. But if I can just point to what this court said in Stack. It said, even assuming as we must, that Microsoft had informed Stack that it planned to introduce a data compression product, Stack could not have known whether or not Microsoft would truly do so. So that's a situation where Microsoft tells Stack that it's going to introduce a competing stock product, which is the thing that ended up taking the company's stock price. And the court says you still can't say, you can't predict. I mean, to take a step back, the problem here is that companies in On24 shoes, they can't predict the future in February 2021 as to what's going to happen with the pandemic, what's going to happen with respect to customer renewals. All we have are allegations that say that customers were indicating that they might not renew or they would not renew and the company was working to try to fight against that. And then it fully disclosed that this was an issue that it was that it was concerned about. It's not just... Sorry, Your Honor. It's an issue they're concerned about, but it seems like if you apply Alphabet, maybe you don't think we should here. If they have actual, you know, some actual data, don't they have an obligation to disclose that? It seems like this was occurring during COVID. And, you know, don't we have to take that fact into account? Or I guess, let me ask you, don't we take that fact into account when we are considering what a reasonable investor would think is material? But that fully supports On24 if you're, if the court is looking at it. Well, but that was a, that was a time of very high uncertainty. And weren't investors in the stock market focused on the effects of the lockdowns and how businesses were adjusting in that kind of environment? I'm just questioning, and I wanted to hear your answers to why a handful was inconsequential, especially if you take into account what, you know, the lowest percentage that the C, any one of the CWs put forward. Well, I think the problem, though, is, Your Honor, that it puts companies in an untenable situation of not knowing, you know, what they need to disclose beyond the actual risk itself. Here, the company said, you know, our recent revenue growth was this challenge statement for, you know, has been significantly impacted by the increasing demand for our platform products at the outset of COVID-19. And then it said, as the impact of COVID-19 lessens, there may be reduced demand. And so that right there is addressing the uncertainty and telling the reasonable investor that if COVID-19 goes down, then there may not have the same financial, you know, sort of great financial success. But Your Honor, on Alphabet, we totally think that Alphabet and Facebook should apply. But we think that Plaintiff is misreading those decisions, because what's being talked about there in Alphabet and Facebook is not the existence of a risk deal. In Facebook, it was that Cambridge Analytica was using the data, and then they disclosed that they were worried that someone was going to use the data. So the concern that the company was worried about, the misuse of customer data, actually had occurred and wasn't disclosed. In Alphabet, it was that there would be some sort of privacy bug that actually occurred and was not disclosed. But the disclosures say nothing about non-ideal customers or atypical customers. You're saying that the statement, which the one I read, I think it was statement four, you know, trying to figure out is that sufficient. But they had knowledge of non-ideal customers or atypical customers, and the disclosures don't say anything about it. But those were the terms allegedly used by, I think, by ON's executives after the IPO to describe the customers signed up during the pandemic. And, you know, it seems like what LeaderCell is alleging, that there was no warning before the IPO that ON24 itself thought its customer base was non-ideal. So I'm just trying to figure out why, and you can see I'm drilling down on this, why wouldn't the exclusion of that information be considered a violation of Section 11? I think that's kind of really the crux of what we're trying to figure out, I'm trying to figure out. The ultimate issue here is that they're concerned that there would be non-renewals. And now we're talking about the customer base transition, you know, allegations they're talking about. But again, those are just inconsistent with the actual offering documents, which were incorporated by reference into the complaint. Because when you look at the offering documents, they make clear that at SER 108, the number of multi-year subscriptions was increasing each year during the 2019 versus 2020. In SER, at the same page, it also said the number of customers that had two or more subscriptions increased from 15% to 29% in September of 2020. So what you're talking about here is a customer, and to take a step back, they also never said, and this is SER 111, that they had any particular type of customer. They said they take large companies, small companies. So the reasonable investor was disclosed that there was not just one type of customer that they were taking. Wait, just a second. I mean, their customer base before COVID was not the short-term customers. It was these people who would be, at least, it was global, it seemed like, and they were trying to get people for long-term contracts, and it seemed like they had a certain type of customer before COVID. Are you saying that's not the case? I'm just saying that their statements are inconsistent with the actual metrics that are disclosed, but ON24 did disclose that it got more additional customers because, you know, during the pandemic, which is all that they needed to say. And so... I don't... I mean, there's still, I think there would be a lot of questions and issues for the plaintiffs if this case is able to proceed, but I'm just looking at it at the Rule 8, the motion to dismiss stage, and trying to figure out this, you know, the answers to these questions. I completely understand, but I think that what this court were to basically say that the mere risk that these customers were not going to renew, which is basically the whole premise of the argument they've made, that would basically extend both Facebook and Alphabet to something that was not an actual event that occurred, and it would be inconsistent with this court's decision in Stack. It would effectively overrule that decision. And I think that the way you reconcile Stack, Facebook, and Alphabet... So even if... Suppose you had customers, 100% of them say, we're not going to renew, and the company was holding onto that information. Under your argument, that would still not be a disclosable fact until it actually occurs. Because you don't... There's no level of... You're saying no matter how certain the customers are, a company would never have to disclose that. Because you don't know it would occur, and that's what this court's case in Stack said. It was assumed that Microsoft would introduce a competing product, and it told Stack that it was going to introduce a competing product. It was assumed, because allegations have to be assumed as true. And the court said that when it depends upon a third party, you can't say that that's going to be an absolute certainty. And so that's the problem the plaintiff's allegations have. Can I ask, just as a final question, from me at least, the district court engaged in finding the witnesses, and whether they were inconsistent, and relying on some documents it took judicial notice of that weren't incorporated, and drawing facts from that. Why was that appropriate at a motion to dismiss stage? So it was because, well one, it's doubly forfeited, because they didn't raise the issue before the district court, and they didn't challenge it in this court. But beyond that fact, it's entirely appropriate to have the documents that were incorporated by reference, to basically have those facts in them to be accepted as true, and for the court not to accept allegations that are inconsistent. That's what Stack says, that's what Steckman says. So this court's precedent is entirely consistent with that. But that's only a portion of the documents. There were other ones that were taken, you know, in footnote, one of the district court's order that they were judicially noticed, not by incorporation. And as to those, you're not supposed to take them, you know, the statements within as true. And yet it seemed as if the district court was taking certain pieces of evidence from those statements in order to draw conclusions from them. That's all the post-IPO financials that we're talking about here. All the offering documents are the pre-IPO stuff that basically shows that there was no actual loss of customers at that point. But for the post-IPO stuff, plaintiff has never challenged the veracity of that. But on de novo review, we're looking at this afresh and seeing if there was any error by the district court, don't we? Right. I think what that goes to, though, ultimately, is that if we take their premise, which I don't believe is true, that there would be sort of like 100% certainty that there would be all this sort of loss of renewals after the IPO. The fact of the matter is, is that those post-IPO documents show that that's not the case. But the point is that you shouldn't be in a situation where you're saying- I mean, I guess what I'd say is I'm not sure whether it's the case or not, we're wading into what seems like tribal questions. People, you know, you had growth, but was that growth commensurate with what was projected by the government as to, by the company, I'm sorry, as to its, you know-  I mean, I think that at the end of the day, none of that is really necessary to resolve this case because what they can't show is that there was this material loss of customers during the, you know, before the time of the IPO. And that's what they would need to show under, you know, stack, alphabet, and Facebook. And they just, they simply can't show that. And so that's, that's sort of the fundamental flaw with their complaint. Thank you very much. Thank you, Your Honor. We ask the Court to affirm. Thank you. I'll give you two minutes. Your Honors, I know I pretty much exhausted my time, but just a couple of quick points. I'm giving you two minutes. Thank you, Your Honor. So first of all, just to go to, let's go right to stack. Council said something about we're putting companies in a position of not knowing what to disclose. But we are not asking for an extension of alphabet and Facebook here. We are asking for a straightforward interpretation of this Court's prior authority stack. Their reliance on stack is misplaced for a number of reasons. We discussed this in our brief, but just briefly, the case is not about predicting this case. It's not about predicting uncertain future events. Here, ON 24 had concrete data about customer intentions through direct customer communications, about non-renewal plans, systematic tracking in a couple of different databases, internal reports, quantifying, expected churn, and management discussions confirming the risk. Also, you have to take a look at, I can't believe I didn't mention this, but CEO Charan at the beginning of the case saying, these are not our ideal customers. The Court brought this up. And then at the end of the case, Charan acknowledges that it was the very non-ideal customers, the SMB and one-time customers that accounted for the high churn. This was picked up by the analysts, JP Morgan and Canaccord. They downgraded ON 24 after identifying the very churn issues that are at the heart of this case. And just a couple of miscellaneous points. We also do allege, we haven't talked about that yet, but omissions under item 303. So even if you don't like the misstatements, we have an omissions claim. Also, Your Honors brought up the customer base shifts. And I just wanted to note that in its first order on the motion to dismiss, the District Court actually did hold that we had sufficiently alleged a claim based on that shift. Thank you. And before you, I just had a question on the ARR, you were going to make a statement on that. I don't know if you did. The statement on the ARR? So in the... Because that's what the District Court relied on. Yeah. So here, I talked before when I was discussing revenue, I was talking about the revenue growth, not the ARR. The revenue growth is the one on page eight of defendant's brief that shows it turned negative. The thing about ARR, it's a lagging indicator because of course, you're going back, you're analyzing the revenue. So it's including that frothy period where they were writing all this new business during the pandemic. So what you really want to look at is the, at least the year over year, if not quarter over quarter revenue growth, the ARR is just irrelevant. Thank you. Thank you. All right. Mr. Hoffman, Mr. Matsui, thank you very much. I know we asked a lot of questions of you, I appreciate your responses and very helpful for us. So thank you. So the case of INRI On 24 Incorporated Securities Litigation, Leader Cell Inotech ESG versus On 24 Inc. is now submitted.
judges: MURGUIA, SANCHEZ, THOMAS